KATIE PROPST, RESPONDENT, v. CAPITAL MUTUAL ASSOCIATION, A CORPORATION, APPELLANT.—124 S. W. (2d) 515.

Kansas City Court of Appeals. January 9, 1939.

*Sam W. James, Jr.* and *L. F. Kinder* for appellant.

*Irwin, Bushman & Buchanan* and *Baker & Baker* for respondent.

BLAND, J.—This is an action in four counts, each count upon a certificate of accident insurance issued by the defendant to the plaintiff, plaintiff claiming the loss of an eye by accident. There

was a verdict and judgment in favor of the plaintiff in the sum of $750 on each of the four counts, or aggregating the sum of $3080, and defendant has appealed.

The four certificates are identical in form. They are all dated the 4th day of November, 1925. They recite that the written application for the certificates and the by-laws of the association now in force or afterwards to be enacted, are taken together and construed as a part of the agreement; that the defendant would, within 30 days after the receipt, at the office of its secretary, of satisfactory proof of the death of or accident to, the applicant, pay the insured, or her beneficiary, the sum of money therein set forth; that payment would be made to insured if she should lose, by accident, and not otherwise, the entire sight of one or both eyes; that "this Association must be notified within ten days from the date of the accident, and loss of the member must occur within sixty days from the date of accident or no benefits will be paid under this certificate."

The by-laws of the defendant provided that "Loss of an eye must result solely through external, violent and accidental means and where disease is contributory to the loss of an eye, or eyes, no benefits will be paid;" also that "Proof of loss by accident to be submitted on form prescribed and furnished by the Association, and shall consist of affidavit of a competent oculist and in case there was no attending physician then by affidavits by witnesses personally knowing the facts."

As before stated, plaintiff's evidence tends to show that she lost the sight of her eye by reason of an accident. Defendant's evidence tends to show that she lost it as the result of the atrophy of the optic nerve caused by optic neuritis which, in turn, was caused by infection from her sinuses.

The evidence on behalf of plaintiff tends to show that sometime between Thanksgiving and Christmas in the year 1927, she, her husband and family were riding in his automobile from their farm to Jefferson City when her husband, who was driving, made a sudden turn in passing another car. This caused her to be thrown against the side of the automobile, striking her head. As soon as her head struck the side of the car her left eye "swelled up and was bruised." At no time since the accident has she been able to see out of the eye.

Plaintiff was born in Germany and did not understand the English language well. She testified that she had always been in good health prior to her injury and that, "well, when it happened it (her eye) hurt. I could not see out of it. And it swelled up . . . swelled right away when it happened. . . . I could not see anything out of it at all;" that when they arrived in Jefferson City her husband wanted her to go to see a doctor but she thought that the eye might get well without medical attention.

However, the condition of her eye, not improving, she went to see

Dr. Howard in Jefferson City about a week after the accident. Dr. Howard treated her eye for several months. He first treated it for about two months when he took plaintiff to St. Louis, where her eye was examined by Dr. Keller. When they returned to Jefferson City Dr. Howard performed an operation on her eye. After returning from St. Louis Dr. Howard treated her eye for two months more. He then told her that the eye was out and he could do nothing for her. She did not go to see him any more after that.

When Dr. Howard told her that nothing more could be done she and her husband immediately went to the office of the defendant in Jefferson City, where they talked with Mr. Dunlap, whom the evidence shows was its secretary and general manager. She testified that the reason she went to see Mr. Dunlap was "I thought we would have to sign some papers so they would pay us then;" that she related to Mr. Dunlap the circumstances of the accident and the loss of her eye and he stated: "He would see about it and he would let us know, but he never did;" that she asked Mr. Dunlap to pay her for the loss of her eye but did not ask "for any papers" and that he did not give here "any papers to sign;" that she and her husband called to see Mr. Dunlap a number of times after this; that Mr. Dunlap always gave them the same answer, that is, that he would see about it and let her know; that she also talked with Mr. Payne, whom the evidence shows was the vice-president of the defendant; that Mr. Payne "was in the office with Mr. Dunlap, and Mr. Payne said there was no claim there for me to get and there was no use to fool with the law because he thought it would cost my farm."

On cross-examination, plaintiff testified that when she went to see Mr. Dunlap, after Dr. Howard told her that her eye was gone, he did not tell her to make out a written statement and that she did not make one, merely "explained it to him;" that she did not remember whether either Mr. Payne or Mr. Dunlap told her that she did not have a claim on account of the fact that she lost the sight of her eye by disease and not accident. She was asked whether they told her that she had not furnished proofs of loss. She stated that she did not understand what was meant by that.

She further testified that she sent for Mr. Vogel, defendant's agent, who sold her the certificates; that she told him "just how it happened;" that she did not tell him that "it (the eye) just went out;" that she did not tell Mr. Vogel that gravel had hit her in the eye; that when Mr. Vogel came to see her he told her "there was no claim for me to get;" that "they hardly ever paid for the loss of an eye, but he said generally a woman got hurt, then he said oh, yes, they do pay."

She further testified that she did not remember whether she told Mr. Dunlap that Mr. Vogel had been to see her; that she did not remember of any of these three men stating to her that she had not

given "them notice in time." She further testified that she took the insurance certificates to Dr. Howard's office and asked him "to sign" them, . . . "so we could get the money" for the loss of her eye; that Dr. Howard told her that he would not sign them; that Mr. Dunlap did not tell her that it was necessary for her to do anything; that she took the certificates to Dr. Howard to be signed because neighbors and others told her that "he was the man who had to fill them out."

Plaintiff's husband's testimony, in the main, was similar to that of plaintiff. However, he stated that she was in error in saying that Dr. Howard told her about two months after they returned from St. Louis that he could do nothing further for her; that this happened about a week after; that they then went to see Mr. Dunlap. He testified that Mr. Dunlap did not say he could not pay the loss because no notice had been given within ten days; that Mr. Payne said, in the presence of Mr. Dunlap, that "they could not do anything;" that it was the day that Dr. Howard told them that plaintiff's eye was gone that they asked him "to sign the papers," and the doctor refused; that no one told them to get a statement from the doctor; that "it was on the policy and that is the reason we took it there, to get him to sign it. Q. When was the first time you were told that you had nothing coming under this policy? A. Well, Vogel, was the first one that said it;" that Mr. Vogel told them this about six months after the accident happened; that the witness saw Mr. Dunlap about 6 or 7 times after this; that Mr. Dunlap, at no time, said that the claim was disallowed, "he didn't say anything. He didn't say he would pay it, and didn't say he would not pay it."

A cataract formed over plaintiff's eye sometime after 1930, the exact date not being shown in the record. This suit was filed on September 6th, 1936. After the suit was filed plaintiff consulted three doctors, Summers, Arrington, Jr., and Stauffer. These three men testified and their testimony, taken as a whole, is to the effect that it was impossible for them to tell from their examinations of plaintiff as to whether the loss of her eye was due to the accident she received or due to an atrophy of the optic nerve but, under the facts, it could have well been caused by an accident; that had it been caused by sinus infection it would have been likely that she would have lost the sight in both of her eyes instead of one.

On behalf of the defendant, Dr. Howard, over the objection of plaintiff, testified that plaintiff lost the sight of her eye as the result of disease; that plaintiff first came to see him on December 23rd, 1927; that an examination of the external part of her eye showed nothing abnormal; that during his treatment of her he discovered that she had sinus infection; that on February 8th, 1928, he observed that there were definite changes in the optical nerve; that there were symptoms of some congestion and neuro-retinitis, of the descending

type, at the end of the optic nerve; that his definite diagnosis at that time was "optic neuritis which had attacked the optic nerve back of the eyeball and advanced toward the retina of the eye;" that he then feared there was going to be a permanent loss of vision in the eye, so he took plaintiff to St. Louis on February 15th, 1928, where his diagnosis was certified by Dr. Keller; that when they returned from St. Louis and, on February 15th, he "opened up some infected sinuses and drained them. The optic nerve condition subsided but when the optic neuritis subsided it left an optic atrophy and that means a wasting away of the nerve. In other words, the nerve was killed completely and this condition was observed until along in April or May, at which time I told the patient definitely that there would be no vision restored."

To avoid a continuance plaintiff agreed that Dr. Keller would testify, if present, as follows: "That he examined the left eye of the plaintiff in this cause on or about the 12th day of February, 1928, at St. Louis, Missouri; that there was no evidence of any traumatic condition at that time and that the condition of the left eye of the said Katie Propst was caused entirely by the disease and not from injury, and that disease alone caused the loss of the sight of her left eye."

Mr. Vogel testified that when he talked to plaintiff about her claim in 1926 or 1927, she stated that she did not know how she lost her eye. "It just went out;" that about two weeks after that he had another conversation with her and she told him that "she was in town one day and that the wind was blowing very hard and it blew a piece of gravel or cinder in her eye."

Mr. Dunlap, on behalf of defendant, testified that plaintiff and her husband called on him in March, 1928 "about her eye claim;" that "She said she had lost an eye. And she said she had bumped it on a chicken coop and she wanted payment on her policies;" that he read the provision of the policies to her from a policy form, stating that they covered the loss of an eye "by violent, external or accidental means," also, the provision "as to the time of notice," and he explained to them that the company would require affidavits from attending physicians and a "written certified statement of the facts as to the cause of the loss or the injury that led up to the loss of the eye;" that there was no physician's statement ever furnished and no written claim ever filed; that he had one other conversation with plaintiff and her husband, which was in February 1936; that at that time Mr. Payne was present and the witness knew that plaintiff had talked with Mr. Vogel about her claim; that his recollection was that he had a conversation with Mr. Vogel along in January, in the neighborhood of a month before plaintiff came to see him; that this was the first information the witness had in reference to the matter. He denied that he told plaintiff at any time that he "would see about

this matter'' and that he ever requested her to come back, that there was a possibility that her claim would be paid; that he suggested that she see any doctors.

On cross-examination he testified that the company had blank proofs of loss ''for death'' but not for the loss of an eye; that it had no blanks to be used in case of the loss of an eye ''because as a rule the specialists or the doctors prefer to make their own report, in their own way;'' that he never prepared any proofs of loss in this case; that he was not asked for any; that when the plaintiff came to see him she told him she had bumped her eye on a chicken coop, that he ''knew plenty about it;'' that ''there was evidence enough at that time to—so that we were pretty definitely sure that there was no accident ever in existence.''

He stated that the reason the claim was rejected was that it was not presented in the form required; that, in addition to this, the by-laws of the association and the provisions of the certificates provided that the loss of eyesight must occur solely by violent, external and accidental means; that where disease is a contributing cause there is no liability; and for the reason that ''the first time a claim was talked of by the claimant, she made the statement that no accident occurred, that her eye just merely went blind, and then she was put right on that and later on she made the statement that she had been thinking things over and that she got a knock on the side of the head—no, I will take that back—then she made the statement that she was in Jefferson City and there was quite a strong wind blowing and a gravel blew up and struck her in the eye, and that is what knocked her eye out.''

Mr. Payne testified that in the latter part of February, 1936, he first became acquainted with plaintiff when she was talking with Mr. Dunlap and she ''was trying to get him to give her just a little something on a claim that she had lost her eye. Do you want the conversation? Q. Yes, go head. A. I was not in the conversation at the time—and she was asking Mr. Dunlap if he could not do just a little something, because she claimed she had lost her eye. There had been no proof filed of the loss;'' that plaintiff turned to the witness and said: '' 'Don't you think he ought to do a little something for me, Mr. Payne?' and I said, 'No I do not;' and she said, 'Why?' and I said, 'Because you have no proof of loss by accident to your eye.' '' ''Q. Did you have any conversation with her in February or March, 1938, or the latter part of 1937? A. I did not.''

On behalf of plaintiff the court gave three instructions. The first told the jury that if plaintiff sustained the entire loss of the sight of her left eye ''because of having been violently, accidentally and through accidental means thrown against the upright part of the top of a Ford touring car in which she was riding, if you so find; and that such loss of sight occurred within sixty days thereafter,

if so; that plaintiff gave the defendant due and timely notice and proof of loss, if so; and that defendant denied liability on plaintiff's claim and refused to pay said amounts upon plaintiff's demand, if you so find, then your verdict will be for plaintiff on each count of the petition."

Plaintiff's instruction 2 is as follows: "The Court instructs the jury that if you find and believe from the evidence that plaintiff made oral demand for payment of her claim to defendant's officers, and that defendant, acting through its officers, refused or neglected to furnish plaintiff with blanks prescribed by the defendant company for making proof of loss, and denied liability, then it waived written proof of loss."

Plaintiff's instruction 3 is as follows: "The Court instructs the jury that if your verdict is for the plaintiff you will also allow her interest on all four counts of the petition at the rate of 6 per cent per annum from thirty days after the date demand was made by plaintiff of the defendant for payment, if you find there was such demand, until the present time."

Defendant's instruction No. 2, told the jury that it was incumbent upon the plaintiff to prove that she lost the sight of her eye and that it was lost "entirely" as a result of an accident, that is, solely through external, violent and accidental means within sixty days from the date of the accident or injury alleged by plaintiff."

Defendant's instruction No. 3 submits to the jury the terms of the certificates and the by-laws of the defendant concerning the giving of notice of the alleged accident within ten days from the date of the accident, and instructed the jury that if plaintiff did not give notice within that time "or has not shown a just and reasonable excuse for her failure to do so, then and in that event the plaintiff cannot recover and your verdict must be for the defendant."

Defendant's instruction No. 4, told the jury that plaintiff was not entitled to recover if disease contributed in any manner to the loss of the sight of her eye.

It is insisted that the petition fails to state a cause of action for the reason that it does not allege that defendant furnished plaintiff with proofs of loss, or, facts sufficient to show waiver of proofs by the defendant.

It is well established that the petition, in cases of this kind, must plead the performance or excuse for nonperformance of all conditions precedent, such as the giving of proofs, loss, waiver thereof or estoppel. [33 C. J., p. 85; Green v. Am. Life & Acc. Ins. Co., 93 S. W. (2d) 1119, 1123; Mayhew v. Mutual Life of Ill., 217 Mo. App. 429.] However, it is sufficient to plead, generally, that plaintiff has performed all of the conditions precedent required of him to be performed. [Jabin v. National Acc. Soc. of N. Y., 41 S. W. (2d) 874, 876; Section 807, R. S. 1929.] The petition does not allege that

plaintiff furnished proofs of loss, or any fact showing waiver thereof or estoppel, nor, does it allege, generally, that plaintiff has performed all of the conditions precedent. It is, therefore, defective.

However, the answer to each count of the petition pleads that defendant "denies that plaintiff has complied with the terms, conditions and provisions of said certificate hereinabove set out and the by-laws of the defendant association, and denies that plaintiff has made any demand upon the defendant in accordance with the provisions, terms and conditions of said by-laws and the certificate or policy." The reply, among other things, denies, generally, the allegations of the answer.

Under the doctrine of aider the answer must be considered as having cured the omission in the petition of the required allegations in controversy. "A petition, declaration, or complaint which fails to allege a material fact, or defectively alleges it, and thereby fails to tender an issue as to such fact, may be aided, and the defect or omission may be cured, by a plea or answer which tenders an issue as to the fact by specificially denying it, averring its nonexistence or alleging the opposite or converse thereof." [49 C. J., p. 866.] *Corpus Juris* cites a number of cases supporting the text, including a great many from this State. In addition to those cases cited from this State the following may also be noted: State ex rel. v. Allen, 85 S. W. (2d) 455, 461; Ricketts v. Hart, 150 Mo. 64. Of course, plaintiff's cause of action must be stated in his petition and he cannot rely upon defendant to state it for him in the answer. The rule in this regard was well stated by this court in Massey-Harris Harvester Co., Inc., v. Federal Reserve Bank of K. C., 48 S. W. (2d) 158, 164, as follows: "As we understand the doctrine of aider by answer, it applies only in those cases where the plaintiff has stated facts upon which a right of recovery is based and some material allegation is omitted which the answer supplies; but the answer can never supply the statement of the cause of action itself." [See, also, Bank v. Clinton, 263 Mo. 200.] It is not necessary for plaintiff to rely, in this case, on the answer supplying the statement of the cause of action itself. Each count of the petition herein states a good cause of action on each policy of insurance sued upon with the exception of the omission of any allegation as to the performance of conditions precedent, or waiver or estoppel. As to a situation of this kind it is well stated by the St. Louis Court of Appeals in Beckman v. The Phoenix Ins. Co., 49 Mo. App. 604, 607: "Performance of a condition precedent must be alleged, or excuse given for the non-performance of it, or else the petition will be bad on demurrer. [Basye v. Ambros, 32 Mo. 484.] Every fact which the plaintiff must prove to maintain his suit he must plead. [Pier v. Heinrichoffen, 52 Mo. 333.] Here, however, defendant's answer, by way of defense, sets up the *non-performance of conditions precedent*

*on the part of the plaintiff,* and the plaintiff took issue by reply.'' (Italics ours.)

Defendant insists that the court erred in failing to give its instruction in the nature of a demurrer to the evidence. In this connection it is urged, among other things, that plaintiff failed to show that she gave notice within ten days after sustaining the loss of her eye and make due proofs of loss, as provided by the policies.

It is admitted that plaintiff did not give notice within the ten day period but it is insisted by the plaintiff that the notice was given the day of the discovery (when Dr. Howard discharged her as incurable) of the loss of the sight of her eye and that this was sufficient. ''Notice is sufficient if given as soon as reasonably possible after discovering, in the exercise of reasonable diligence, that an injury has given, or probably will give, rise to a claim, even though such discovery was not made in time to permit notice or proof within the period specified following the injury which directly resulted in the condition upon which a claim is based.'' [7 Couch Cyc. of Ins. Law, p. 5454.] ''Nor need notice of loss of the sight of insured's eye be given until he has become reasonably certain that the sight has been lost.'' [7 Couch Cyc. of Ins. Law, p. 5484. See, also, St. Paul & Kansas City Short Line R. Co., et al. v. United States Fidelity & Guaranty Co., 105 S. W. (2d) 14.] In that case the policy provided that notice should be given ''as soon as reasonably possible.'' The court ruled l. c. 24: That insured was not required ''to give insurer notice until such time as, from the facts of the injury and its progress, it begins to appear to a person of reasonable care and prudence that a possible liability of the assured to answer in damages might exist.'' [See, also, 29 A. L. R., pp. 500 to 506.]

Defendant's witnesses did not even assign the failure to give notice as a reason for its refusal of the claim. We think that, under all of the circumstances, if notice was not waived, whether it was timely given was for the jury.

Aside from this, there was no showing that defendant was prejudiced by the failure to give the notice within ten days after receipt of the accident. [St. Paul v. K. C. S. L. R. Co., et al. v. U. S. F. & G. Co., *supra,* l. c. 25.]

It seems to be admitted by the parties that the furnishing of the proofs of loss, in the manner provided for in the certificates, was a condition precedent to the maintainance of this action.

The certificates do not provide when proofs of loss should be made, except that the loss would not be paid until sixty days after the receipt by the association of such proofs. The by-laws provide that the proofs shall be made as follows: ''Proofs of loss by accident to be submitted on forms prescribed and furnished by the Association, and shall consist of affidavit of a competent oculist and in case

there was no attending physician then by affidavits by witnesses personally knowing the facts.'' The certificates refer to the by-laws and, there being nothing inconsistent between the provisions of the two, they should be construed together. [45 C. J., p. 34; Laker v. The Royal Fraternal Union, 95 Mo. App. 353.]

It is apparent that no proofs were furnished as provided by the by-laws. However, we think there was evidence tending to show that such proofs were waived. The evidence on behalf of the plaintiff tends to show that if the association did not actually deny liability on grounds other than that no proofs had been furnished, the circumstances clearly warranted the inference that liability was and would be denied, it being not necessary that the denial be express or unequivocal. [7 Couch Cyc. of Ins. Law, p. 5554.]

Plaintiff testified that Mr. Payne told her ''there was no claim there for me to get and there was no use to fool with the law because he thought it would cost my farm;'' that Mr. Vogel told her ''they hardly ever paid for the loss of an eye, but he said generally a woman got hurt, then he said oh, yes, they do pay;'' that Vogel came to the house and said ''there was no claim for me to get. . . . There was no claim for me.''

Plaintiff's husband testified that Mr. Dunlap finally said, when the witness threatened to turn the matter over to a lawyer: ''Well, crack your whip.'' He also testified that Mr. Payne stated in the presence of Mr. Dunlap that ''they could not do anything. We won't do anything.''

Denial of liability on grounds other than failure to furnish proofs of loss is a waiver of such proofs if made before the proofs are due. [1 C. J., p. 480; Lampheimer v. Northwestern Mut. Life Ins. Co., 24 S. W. (2d) 1062, 1064; 7 Couch Cyc. of Ins. Law, p. 5545.] Denial of liability on the ground that disease rather than accident caused the disability of an insured waives proofs of loss under an accident policy. [7 Couch Cyc. of Ins. Law, p. 5558.]

It follows that there is no merit in the contention that the instruction in the nature of a demurrer to the evidence should have been given because of the failure to give the required notice and to furnish the required proofs of loss.

It is insisted that plaintiff's instruction No. 1 is erroneous, because it fails to have the jury find that plaintiff lost the sight of her eye *solely* through external, violent and accidental means. Defendant says that the instruction ''does not require the jury to consider the possibility of disease being a contributing factor to the loss of the eye.'' If the disease, if any, did not contribute to the loss of the eye or if the disease, if any, was a result of the accident, defendant would be liable, but if the disease, if any, was present and it cooperated with the accident in bringing about the loss of the eye, and was the proximate cause thereof, the accident cannot be considered

as the sole cause, or as the cause independent of all other causes. [5 Couch Cyc. of Ins. Law, p. 4013.] Plaintiff's instruction No. 1 does not use the word "solely." Ordinarily, the use of such words in connection with the others mentioned in the clause in question adds nothing to the clause. See Ward v. Aetna Life Ins. Co., 82 Nebr. 499, 506, where the court said: "If the word 'solely' is left out of the sentence, the logical meaning of the clause is not changed. It is still required that death should result from the injury, and this excludes the idea of other independent or cooperating causes. Starting with a bodily injury, all morbid changes in the exercise of vital functions or the texture of the bodily organs which result from or are induced by such injury should be regarded as the effect thereof, and not as independent causes. When death results from any such morbid change so resulting from or induced by such injury, the injury, and not the morbid change induced by it, is the cause of death. Beginning with a primary cause, conditions induced by such cause are effects thereof, and every condition so induced must be considered in relation thereto as an effect, and not as a cause." While the instruction is awkwardly worded in that it does not directly have the jury find that plaintiff lost the sight of her eye through external, violent and accidental means, the facts submitted constituted such a loss by such means. However, the instruction may be somewhat ambiguous or obscure on the subject but, if so, the issues were made perfectly plain by the giving of defendant's instructions No. 2 and 4. [Sutter v. Met. St. Ry. Co., 208 S. W. 851, 853.]

However, defendant insists that, as this instruction covers the entire case and directs a verdict, without submitting the defense that the loss of the eye was due to disease, it was erroneous on that ground. Disease occurring after the issuance of the certificate was not an affirmative defense and could have been shown under a general denial. [Cross v. Wears, 67 S. W. (2d) 517.] If the loss of the eye was caused through external, violent and accidental means, then it could not have been caused by disease contributing to the loss. The instruction, necessarily, excludes any such idea. [Ward v. Aetna Life Ins. Co., supra.] In addition to this, the defense, if such it can be called, was submitted in defendant's instruction No. 3, and there was no error. [Schrieber v. Central Mut. Ins. Co., 108 S. W. (2d) 1052, 1058; Mitchell v. Wab. Ry. Co., 334 Mo. 926; Heigold v. United Rys. Co., 308 Mo. 142.]

The instruction submits that proof of loss was made. There is no evidence that this was done, at least in the manner contemplated by the by-laws which, by necessary inference, required that the proof should be in writing. Of course, there is no claim that proof of this character was furnished. However, we think that it was waived, as a matter of law, by the defendant. As to the furnishing of such proof the by-laws provide: "Proof of loss by accident to be sub-

mitted on forms prescribed and furnished by the Association, and shall consist of affidavit of a competent oculist and in case there was no attending physician then by affidavits by witnesses personally knowing the facts."

It will be noted that the proof of loss required was to be submitted *"on forms prescribed and furnished by the Association."* It is undisputed that no such forms were furnished the plaintiff. In fact, defendant's evidence shows that no such blanks were in existence that could be furnished.

The question presents itself as to whether defendant could be said to have waived proof of loss in not furnishing forms therefor in view of the fact that plaintiff made no request for blanks. We are, therefore, called upon to interpret the meaning of the by-law as to whether the duty was placed upon defendant, upon receiving from plaintiff notice of the accident, to furnish the forms without any request therefor from the plaintiff. It would seem that proof of loss in the form required by the by-laws was for the special benefit of the defendant and, if it desired such formal proof, it should have initiated the matter of it being supplied by the plaintiff. A similar matter was well decided by the Supreme Court of Mississippi in Atlantic Horse Ins. Co. v. Nero, 108 Miss. 321, 328, where it was said: "The policy itself provides that proofs of loss should be made 'upon and in compliance with forms issued by' the defendant. This provision of the policy could not be complied with unless the defendant furnished to the plaintiff a 'blank' or 'form' upon which to make the necessary proof and by which he would also be advised of the character of proof desired; and no such blank or form was furnished to him. *The defendant was notified of the death of this hose, and if it desired further proof thereof, additional to that called for in its telegram, it should have complied with the terms of its policy by furnishing to the plaintiff a blank or form upon which to make it.* Cooley in his briefs on the Law of Insurance (page 3517), refers to the fact that 'in Missouri it is provided by statute that a failure of the company to furnish blanks shall estop it to complain of insured's failure to furnish the proofs,' and states that: 'In the absence of statute the company will not be estopped by a failure to deliver blanks, unless the insured had some reason under the policy, or on account of the company's promises, to expect it to furnish the blanks.' This seems to be authority for the rule we have applied, for the statement is that the company will not be estopped 'unless the insured had some reason under the policy . . . to expect it to furnish blanks,' and here the policy itself expressly so provides." (Italics ours.)

The Missouri statute referred to in the quotation from Cooley's briefs on the Law of Insurance contained in the case last cited is now section 5827, Revised Statutes 1929. This section provides that

notice be given to the company of loss by fire and that "then it shall thereupon become the duty of such insurance company to furnish to the person, persons or corporation incurring such loss or damage, such blank forms of statements and proofs of loss as such insurance company may desire to be filled out." It is held in this state, in view of the provisions of this statute, that after the company receives notice it is its duty to furnish, or offer to furnish, insured with blank forms for proofs and in order to defeat recovery in this regard upon the policy, it must show that the insured refused to receive or to fill out and return the forms to the company. [Meyer Bros. v. Ins. Co., 73 Mo. App. 166, 171, 172. See, also, Bank v. Assurance Co., 106 Mo. App. 114.]

A similar holding as to that made in the Mississippi case will be found in National Masonic Accident Association v. Seed, 95 Ill. App. 43, 51 and Phoenix Accident & Sick Benefit Association v. Stiver (Ind.), 84 N. E. 772.

However, it is defendant's contention that the words "Proof of loss by accident to be submitted on forms prescribed *and* furnished by the Association," as required by the by-laws, are to be construed as meaning that such proof shall be submitted on forms prescribed *or* furnished by the association, as the words "prescribe" and "furnished" are not synonymous. (Italics ours.) We take it that defendant means that if the two words are taken in the conjunctive the word "prescribe" is without any force. In arguing the matter defendant says that the word "prescribe" means to direct, or to impose as a peremptory order. While, the word "furnished" is to be defined as supplied or provided; that while the defendant did not furnish forms, its by-laws prescribed what the proof of loss should consist of, that is, an affidavit of a competent oculist, and plaintiff should have submitted proof in accordance with the by-laws even though forms were not furnished by the defendant.

We think that the words "prescribed" and "furnished" taken in relation to the matter in which they appear in the by-laws, are to be interpreted in the way they appear in the context, that is, in the conjunctive and not in the disjunctive. We are of the opinion that, in the use of these words in the conjunctive, it was intended that the insured should not only make out the proof on forms furnished by the company but that she should not have the authority to question the right of defendant to furnish the blanks in the *form* supplied by it so long as it generally conformed to the description in the by-laws of such form.

Therefore, taking the evidence in the most favorable light to defendant, it is apparent that, in not furnishing forms upon which plaintiff was to make proof of loss, said proof was waived, as a matter of law, and the error, if any, in that part of the instruction submitting that the plaintiff furnished defendant "proof of loss,"

when there was no evidence that such proof was furnished, was harmless. The instruction having required the jury to find more than was necessary in order to render a verdict for the plaintiff, it cannot be held to be reversibly erroneous. [Moore v. McHaney, 191 Mo. App. 688, 697; Plumlee v. Swan Mch. Co., 202 S. W. 586.] From what we have said there was no error in the giving of plaintiff's instruction P-2 on the question of waiver of the proof by the refusal or neglect of defendant to furnish the blanks.

The evidence taken in its most favorable light to the defendant shows that it requested that plaintiff furnish an affidavit of her attending physician or an eye specialist, or a written certified statement of the facts showing that the loss of her eyesight was the result of an accident and that she failed to procure the required affidavit from her attending physician showing that the loss of her eyesight was caused by an accident. This demand by the defendant upon plaintiff was not in conformity with the by-laws and was one defendant had no right to request. The fact that it would have been impossible for plaintiff to have furnished the character of proof mentioned in the by-laws, that is, an affidavit of the attending physician, even if forms for proof had been furnished by the defendant, does not affect the matter as such a proof may not have been required if the refusal of Dr. Howard to execute such proof was arbitrary or unjust. [O'Neill v. Mass. Benefit Association, 18 N. Y. S. 22.] In any event, it was the duty of the defendant to furnish the forms so that plaintiff could have presented them to the doctor for his action, so that if he refused to fill them out favorably to plaintiff, she could have shown some legal excuse, if any she had, why the doctor so acted. In addition to this, it was not known by the defendant that the doctor would not make out a favorable proof at the time defendant was notified of the accident and was called upon to furnish the forms. It was the intention of the defendant at that time which is material on the question of waiver.

It is insisted that the court erred in permitting Dr. Summers, a witness for the plaintiff, to use certain prints taken from a medical book, showing pictures of an eye, to illustrate his testimony. The testimony of this doctor was to the effect that these prints or pictures were accurate. However, one of them purports to show the condition of the eye in "diabetic retinitis" and the other in "amaurotic family idiocy." The introduction of the pictures in evidence, if they were merely of a normal eye, would not have constituted error under the circumstances. [22 C. J., pp. 921, 922; Young v. Dunlap, 195 Mo. App. 119, 125; Bustian v. Young et al., 152 Mo. 317; Savary v. State of Nebr., 62 Nebr. 166; McGar, Admx., v. Bristol, 71 Conn. 652, 655; The People v. Gossett, 93 Calif. 641.] It is difficult to see why the witness used photographs showing the condition of the eye in diabetic retinitis and amaurotic family idiocy

to illustrate his testimony. However, in view of the actual use made by the witness of the prints, there was no reversible error committed. .Complaint is made of .the closing argument of counsel for plaintiff. We have examined the pages of the record referred. to in defendant's brief in reference to. this matter and find that there are a great many instances of claimed prejudicial remarks of counsel for plaintiff where the remarks were not objected to and in other instances the court sustained the objection of counsel for defendant to the remarks and the court was. asked to do nothing further. At one place in his argument, counsel for plaintiff said: "I undertake to say to you that when any company issues a policy by any officers, written as this policy is written, you must approach anything they say and do with great caution. Mr. Cuthbertson: I object. Your Honor, to that statement. The Court: Objection overruled." The objection was not sufficiently definite to call the court's attention to the impropriety, if any, in the argument. [Carroll v. Mo. Power & Light Co., 96 S. W. (2d) 1074, 1081.] The judgment is affirmed. All concur.