Harold HARRIS, Respondent,

v.

NEW YORK LIFE INSURANCE COMPANY, Appellant.

No. KCD 26729.

Missouri Court of Appeals, Kansas City District.

Nov. 4, 1974.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 2, 1974.

---

Joseph E. Stevens, Jr. and William C. Hopkins, II, Kansas City, for appellant; Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, of counsel.

H. George Lafferty, Jr., Kansas City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

PRITCHARD, Presiding Judge.

Respondent recovered judgment in this court-tried case for $25,000.00, plus $5,500.-00 interest, on his action against appellant for the proceeds of an accidental death policy of insurance issued by appellant upon the life of Mrs. Marceil A. Harris, respondent's wife. The basic question is whether Mrs. Harris' death was proximately caused by the negligence of her physician so as to be an accidental death within the terms of the policy.

It is respondent's theory that the death of his wife, who had been, since about 1962, afflicted with a mild diabetic condition, was accidental within the terms of the policy, and was proximately caused by the negligence of her physician in failing to administer insulin to her prior to, during and after the removal of a goiter.

The insuring agreement of the policy provides that appellant would pay "THE BENEFITS provided under the Benefit provisions of this policy, subject to the provisions, conditions, exceptions and limitations stated in the policy, for loss, as specified in said Benefit Provisions, that results from accidental bodily injury which occurs while this policy is in force and which causes the loss directly and independently of all other causes (referred to in this policy as 'covered injury')." The exception upon which appellant relies is: "This policy shall not cover any loss which is caused or contributed to by one or more of the following: (a) infirmity of mind or body, or any illness or disease other than a bacterial infection occurring in consequence of accidental injury on the exterior of the body."

Dr. Roy Drake had been Mrs. Harris' physician since 1966 when she was hospitalized, tested, and found to have been a

mild diabetic. He put her on the anti-diabetic drug, Orinase, two per day. When she was admitted to Baptist Memorial Hospital on July 9, 1969, it was known that she was a mild diabetic, and the admission laboratory test showed that she had a four plus sugar without acetone. Dr. Drake acknowledged that the sugar was a large amount, the highest that the laboratory test equipment used would measure. On July 12, 1969, the nurse's notes indicated "Clinitest, Four plus, acetone very large." Dr. Drake acknowledged that to mean that Mrs. Harris was having incomplete metabolism of her sugar, but that he did not see the nurse's notation. In fact, he noticed the notations only when he was going over the chart after Mrs. Harris' death. His position was: "There's no written thing that you have to read the nurse's notes. As I might mention, they have even quit making notes in some hospitals because it wasn't very productive." He testified that if the patient has not been on insulin, but just oral diabetics, it is not given prior to operation.

For respondent, Dr. Ralph Hall, physician and Director of Medical Education and Research at St. Luke's Hospital, and a specialist in endocrinology, testified, using Mrs. Harris' hospital records, which were in evidence. On July 9, 1969, upon her admission, according to the records, she had 300 milligrams per cent blood sugar, which could not be controlled by oral medication. Two Orinase tablets taken orally would have been insufficient for the amount of diabetes she had. The 348 milligrams per cent of blood sugar, on July 10, 1969, before she went to surgery, was moderately high. If a mild diabetic is controlled, there ought to be a reading of under 150 milligrams per cent. If it is high it is a sign that the patient is not in good control. With a reading of 348 blood sugar, most of the textbooks will state that the patient ought to receive insulin prior to going to surgery, and there would be a question in most physicians' minds if surgery ought not to be delayed for a day. The next safeguard would be to make continued

tests of the blood and urine sugar—urine tests for sugar and acetone four times a day, and blood sugar tests two times a day, on somebody who has diabetes. Insulin was not given to Mrs. Harris before the operation, the day of the operation, or the day after the operation. The clinitest of July 12, 1969, noting "acetone very large" means that the patient is severely out of control and that is a dangerous sign; it means the patient needs immediate attention. With the four plus test result, further tests should have been done to determine specifically how acid the blood was, how much sodium, potassium, carbon dioxide, or bicarbonate were in the blood. None of these further tests were done for Mrs. Harris.

1000c.c. of glucose was given to Mrs. Harris on July 12, 1969, which should not have been done under the circumstances. She should have had normal saline in all probabilities, depending on what the tests showed, or she may have needed bicarbonate rather than saline to raise the alkaline to get rid of some of the acidosis caused by the diabetes, which is the normal textbook standard treatment.

On July 13, 1969, there was a four plus and large acetone test result, again indicating the patient's diabetes was out of control, and had been for 24 hours prior. In that 24 hour period, "You want to make sure the patient is getting potassium and sodium," a routine laboratory test, which was not done. Low serum potassium, in a diabetes case, is what stops the heart. No insulin was given to Mrs. Harris until 9:00 p. m. on July 13, 1969, six hours before she died. Only 50 units of insulin was then administered, which was not a sufficient dose—100 to 200 units should have been given. For the first times, at 11:00 p. m., July 13th, and 1:45 a. m., July 14th, sodium bicarbonate, to correct acidosis, was given, and it was not done in time.

In Dr. Hall's opinion, the cause of Mrs. Harris' death was diabetic acidosis and cardiac arrest. The cause of the diabetic acidosis was diabetes. Diabetic acidosis

occurs when the body cannot utilize sugar that is taken in, and it starts to use fat. The end product of fat metabolism is acid, "and the more the body tries to use the fat as a fuel, the more acidotic the body becomes, and to combat that you try to get sugar into the cell, and get the body to use sugar. That is why you use insulin, so that the body quits using the fat for fuel." Mrs. Harris' death certificate states that she died of aspiration pneumonitis, to which diabetic coma was a contributing cause, which in turn was caused by diabetic acidosis. If Mrs. Harris had received the proper amount of insulin before and following the operation, she would not have gone into the diabetic coma. The hospital records showed that Mrs. Harris manifested a hoarseness. There is a test which could have been given, but which was not given, to establish whether she did have a respiratory problem, respiratory acidosis, following the operation. "People with diabetic acidosis have—overbreathe and try to blow off carbon dioxide, because that improves their acidosis a little bit, if they can get rid of carbon dioxide." Neither would the thyroid condition, nor the thyroid operation, in and of themselves, have caused Mrs. Harris' death, in Dr. Hall's opinion. If was further his opinion that the mild diabetic condition which Mrs. Harris had when she entered the hospital, if properly treated, would not in and of itself caused her death. He would not have expected her to die as a result of the surgery.

As to nurses' notes, Dr. Hall testified that they are kept so that when the physician comes in to make rounds he can find out what had been going on in his absence from the floor and from the patient. When a patient is treated in the hospital, in the normal course of practice of medicine, physicians should refer to nurses' records. It was Dr. Hall's opinion, according to the records, that Dr. Drake did not exercise that degree of care and skill normally exercised by a physician in this community in the treatment of Mrs. Harris. Neither the diabetes, nor the thyroid condi-

tion would have caused Mrs. Harris' death had Dr. Drake exercised that degree of care and skill exercised by a doctor in this community.

On cross-examination this was elicited from Dr. Hall: "Q. Doctor, did the fact that Mrs. Harris was a diabetic, in your medical judgment, cause or contribute to cause her death? A. Yes." On re-direct examination, Dr. Hall testified: "Q. Doctor, you have stated on cross-examination from Mr. Stevens that diabetes caused or contributed to Mrs. Harris's death? A. Yes. Q. Would you explain that, and how it contributed to cause Mrs. Harris's death? A. It lead to diabetic acidosis, the acidosis then activates the heart and the blood gets very acid, and the heart ceases to pump adequately, you get low blood pressure, your sodium potassium can drop so that the heart can—what we call ventricular fibrillation." The thyroid condition might have caused or contributed to her death, but would not have done so if Dr. Drake had exercised that degree of care and skill exercised by a physician in this community.

In its first point appellant contends that the undisputed facts showed that the death of the insured was expressly excepted from coverage by the insurance contract. In support of the contention reference is made to certain deposition testimony of Dr. Hall, said to be available to the court at the time of a motion for summary judgment. That testimony is not available to this court. The deposition is not in evidence and all that bears upon the question is the entirety of Dr. Hall's testimony, and explanations thereof, above stated, given at the trial.

■■■■ In Gennari v. Prudential Insurance Company of America, 335 S.W.2d 55 (Mo.1960), plaintiff sued for double indemnity benefits of two life insurance policies. The insurer promised to pay the face amount of each policy if the death of the insured occurred " 'as a result, directly and independently of all other causes, of bodily

injuries, effected solely through external, violent and accidental means,' provided, however, that said benefit should not be payable if such death resulted, among other causes, '* * * directly or indirectly from bodily or mental infirmity or disease in any form.'" [Transferring opinion, Gennari v. Prudential Insurance Company of America, 324 S.W.2d 355, 357 (Mo. App.1959).] The evidence was divergent as to whether the deceased died as a result of a cerebral hemorrhage due to [pre-existing] hypertension and hypertensive cardiovascular disease, or whether death was caused by great shock caused by the sudden and radical change in temperature from cold to hot when deceased went from a cold ice box to a very warm area. The case was reversed and remanded for new trial because of one error in giving a defendant's instruction, permitting the jury to find that the death was caused by deceased's diseased condition, without the added requirement that the jury find that condition to be the direct and proximate cause of the insured's death. In discussing this determinative issue in the case, the court said, 335 S.W.2d 62 [5], "It is well settled that although a person may have a weakened body and be infirm as the result of such things as age or disease, nonetheless if death is directly caused by external, violent and accidental means the accidental ery may be had. For an injury which might naturally produce death in a person of a certain condition of health is the cause of his death, if he dies by reason of it, even if he would not have died if his previous health had been different. *In such event the condition of previous health is merely a predisposing and remote cause and not the direct, proximate cause, as contemplated by the policy, notwithstanding such condition might have cooperated, concurred in and contributed to death.* (Citing cases)" (Italics added.) The court in Gennari did discuss the difference between "true" exceptions, wherein the burden of proof as to the exceptions lie with the insurer, and those which are merely "redundant" to the insuring clause,

being a mere disavowal of plaintiff's claim of death caused by accident, wherein the burden of proof remains with the plaintiff. That discussion is of no consequence here. The issue under the rule of law of Gennari, above italicized, is whether Mrs. Harris' death was proximately caused by the negligence of Dr. Drake in omitting to read the results of laboratory tests on her chart, and in turn failing to take steps to halt the condition of acidosis which led to her diabetic coma. Appellant seems to argue that the exception clause, "this policy shall not cover any loss which is caused or contributed to by * * * (a) any infirmity of mind or body, or any illness or disease * * *" shall be given full force and effect as a matter of law, because the testimony of Dr. Hall (and also that of Dr. Drake) is that Mrs. Harris' condition of mild diabetes was a contributing cause of her death. The argument ignores the explanations of what happened to Mrs. Harris in the hospital, and the clear, unequivocal testimony of Dr. Hall that but for the negligence, the lack of exercise of the proper degree of skill, care and treatment, of Dr. Drake, Mrs. Harris would not have died. Aside from the procedural effects of pleading and proving a "true" exception, and that of the burden of proof of a plaintiff to prove accidental death, when met with a clause amounting to a mere disavowal of the claim, the treatment is the same: The proof for recovery, or for a defeat of recovery, must show the proximate cause of death. Gennari, supra; Hughes v. Provident Mut. Life Ins. Co. of Philadelphia, 258 S.W.2d 290, 292, 293 (Mo.App.1953), where the same claim to defeat recovery was made, "plaintiffs' evidence conclusively established the fact that the insured had a disease which contributed to his death and was, therefore, excluded under the terms of the supplementary agreement for accidental death benefits." The evidence was that deceased sniffed hair into his nose which caused a violent sneeze, acceleration of blood pressure, and a rupture of preexisting weakened blood vessel. The court said, "Furthermore, it is

our opinion that such defense would not be valid here, whether considered under the general denial as contravening the plaintiffs' proof of the issue 'independent of all other causes' or if considered under the exception clause of the policy. This for the reason that under such policies, when accidental bodily injuries of a person in good health are shown as here, followed closely by death, the only causes of death that can be shown to defeat recovery are such as are direct and proximate causes. Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S.W. 592, 595. * * * Granting the accidental means, as defendant assumes and the evidence tends to prove, such condition of the walls of the blood vessel would thus plainly be a *remote* cause, if any, or mere condition and *predisposing cause* of the rupture and not a direct, efficient, procuring, proximate cause." The statement is made in Elbe v. John Hancock Mut. Life Ins. Co., 155 S.W.2d 302, 304 [1, 2] (Mo.App.1941), quoted in Hughes, supra, "The rule of construction which seems to obtain in some jurisdictions respecting policy provisions similar to the provision with which we are here concerned, that is, if an existing disease or infirmity contributes to cause the death of the insured in the sense that death would not have resulted but for the existing disease or infirmity the insurer is not liable, does not obtain in this state. On the contrary, the maxim causa proxima non remota spectatur [the direct and not the remote cause is considered] is applied." That statement remains accurate to the present time. See other cases cited and commented upon in Hughes; Young v. New York Life Insurance Company, 221 S.W.2d 843 (Mo.App. 1949); Anno. 25 A.L.R.3d 1386, 1388, stating "The general rule of insurance law is that only the proximate cause of loss, and not the remote cause, is to be regarded * * *"; and "In determining the cause of a loss for the purpose of fixing insurance liability when concurring causes of damage appear, the proximate cause to which the loss is to be attributed is or may

be the dominant or efficient cause—the one that sets the others in motion—although other and incidental causes may be nearer in time to the result and operate more immediately in producing the loss."

The recent and analogous case, following Gennari, Lindemann v. General American Life Insurance Co., 485 S.W.2d 477 (Mo. App.1972), is of help. There the insured fell, causing the round ligament to be pulled free from the liver, resulting in excessive bleeding, which was in the opinion of the doctor the cause of death and which was in turn caused by the fall. It was discovered that the deceased's liver was cirrhotic, and "The surgeon readily admitted that the severely cirrhotic liver was a strong contributing factor. Given a normal liver, the doctor could not say Lindemann would have survived, but the chances would have been very good. Without the fall, he was of the opinion that Lindemann would not have died when he did." In ruling against defendant's claim that the fall was not the sole cause but was at most a contributing cause with the liver condition (similar to the claim here that Mrs. Harris' death was not solely caused by Dr. Drake's negligence, but was contributed to by her pre-existing diabetes), the court noted that the doctor maintained that the death was caused by the loss of blood from the injury to the liver, and the court held that the "essential, precipitating cause of the insured's death was the internal bleeding caused by the injury", and said, loc. cit. 485 S.W.2d 480 [9], "We are here concerned with the direct, proximate cause of Lindemann's death. We are not concerned with predisposing or remote causes."

Appellant cites Propst v. Capital Mut. Assn., 233 Mo.App. 612, 124 S.W.2d 515 (1939). In that case judgment for plaintiff was affirmed. There was no occasion to rule the propriety of an instruction given on behalf of defendant submitting that plaintiff was not entitled to recover if disease contributed in any manner to the loss of her eye. Since the Gennari case ruled that a similar instruction was in error be-

cause it failed to submit the element of proximate cause, the instruction was probably wrong in Propst. In any event, that case is of no help to appellant. Nor is Christianson v. Metropolitan Life Ins. Co., 102 S.W.2d 682 (Mo.App.1937). As noted in Hughes, supra, the Christianson case went off on the sufficiency of the plaintiff's proof. Although the court did remark that the contract undertakes "to restrict as to coverage of results 'caused or contributed to, directly or indirectly, wholly or partially by disease'", it is highly doubtful that such clauses would be enforced as a matter of law today in view of Gennari, and cases following it, stating that the inquiry is what the proximate cause of death is, and not what the predisposing or remote cause may be.

Under Point II A, appellant contends that the death of the insured was expressly excepted from coverage under the insurance contract. The argument is that the evidence unequivocally established that loss was "caused or contributed to" by the deceased's pre-existing bodily infirmities and illnesses, and therefore it is an excepted risk of coverage. Reference to the above ruling as to the proximate cause of Mrs. Harris' death disposes of the contention. Gennari; Hughes, supra. That ruling also covers appellant's Point II B(1) that the evidence failed to show Mrs. Harris' death resulted from accidental bodily injury directly and independently of all other causes; being again the argument that the pre-existing illnesses and bodily injuries proximately caused her death. Hughes, supra, ruled that it makes no difference that the defense be considered under the general denial of proof of the issue " 'independent of all other causes' " or considered under the exception clause, since the sole inquiry as to cause of death is the direct and proximate cause. Under the controlling cases, Mrs. Harris' diabetic condition was a remote, passive cause of her death. The producing cause of death was Dr. Drake's negligence, which under the evidence was not a mere concurring cause

which would make operative as a matter of law the clause that death must result from accidental bodily injury directly and independently of all other causes, as argued under Point II B(2).

Under all the evidence, and the law, the trial court's conclusion that Mrs. Harris' death was proximately caused by the negligence of her physician, and not by her pre-existing diabetic condition, is manifestly correct.

The judgment is affirmed.

All concur.