HELEN D. KRUG, RESPONDENT, v. THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, A CORPORATION, APPELLANT.—149 S. W. (2d) 393.

Kansas City Court of Appeals. January 27, 1941.

*William C. Michaels, Robert E. Coleberd* and *Albert L. Reeves, Jr.*, for appellant.

*Louis W. Dawson* and *Michaels, Blackmar, Newkirk, Eager & Swanson* of Counsel.

*Woodruff & Gard* for respondent.

1230

[black redacted block]

BLAND, J.—This is an action upon a double indemnity, or accidental death benefit, provision of a life insurance policy, issued by the defendant, on the life of Fred H. Krug, in which the plaintiff, his daughter, is the beneficiary. There was a verdict and judgment in favor of the plaintiff in the sum of $2500, together with interest in the sum of $288.24. Defendant has appealed.

The policy provides for the payment of the indemnity on due proof that insured died as a direct result of bodily injury effected solely through external, violent and accidental means, independently and exclusively of all other causes of which there is evidence by a visible contusion or wound on the exterior of the body, and that death occurred within ninety days after the date of the injury. It further provides that the accidental death benefit will not be payable if death results directly or indirectly from disease or bodily or mental infirmity, or from other specific causes not necessary to mention here, because not material.

Insured died on January 1, 1938. Plaintiff claimed at the trial that his death was the result of a fall from a stepladder (of which event there was no eye-witness) causing a rupture of the spleen.) Defendant contended that his death was caused solely from leukemia, a disease of the blood making organs causing the production of an abnormal number of white blood cells.

The facts show that the time of his death insured was 52 years of age; that he lived in Russell, Kansas, where he was employed as City Clerk; that for several years he had been very active in business, lodge and church affairs in that city; that he engaged in these activities very extensively; that he was a jovial, good-natured individual and appeared to be in good health; that several days prior to December 21, 1937, he put up electric wiring with colored light bulbs on two Pine trees in his front yard, one on each side of the sidewalk leading from the street to his front porch; that in the evening of that day, at insured's request, Mr. Sirosky, the city electrician, came to his home with two ladders, one a 10-foot ladder and the other a stepladder, and they put up a Merry Christmas sign, electrically

lighted, between two Elm trees on the public sidewalk parking in front of insured's house. This work was completed between 6 :00 and 7 :00 o'clock of that evening.

Mr. Sirosky, testifying for plaintiff, said that insured helped put up the sign, but just what insured did toward that end, is not stated. However, insured asked Mr. Sirosky to leave the stepladder, as some one, the night before, had taken some of the light bulbs from the wiring which theretofore had been put up. The witness testified that they replaced the bulbs and insured said he desired that the witness leave the stepladder so that insured could take out those bulbs that could be reached from the ground (insured was five feet five or six inches in height) ; that the ladder was removed the second day but the right leg from the ground to the first step was broken off. There was other evidence that the ladder was taken away ''a few days before Christmas'' and was later destroyed. The piece broken off was not removed with the ladder.

Mrs. Krug testified that insured was in the habit of going out every evening and taking down some of the bulbs between the two Pine trees; that on the evening of December 21st, about the time that he had been going out to take the bulbs out, she saw him put on his overcoat and hat and go out of doors; that she then went up-stairs to bed and she saw him no more·that evening; that the next morning, when she came down-stairs, she saw a paper sack on the dining room table with the light bulbs therein; that these light bulbs were not on the dining room table the evening before; that when she came down that morning, and before breakfast, insured showed her what she described as bruises ''on his chest right over his heart;'' that this was all that he showed her at that time; that at the noon-hour when he came home his brother, Jake, was there and he showed his brother the bruises over his heart and then pulled up his trouser leg and showed them his leg; that ''there were bruises. His leg was black and blue and there was two places where the skin had been broken;'' that there were some bruises along his left side also; that the discoloration over his chest and the discoloration over his abdomen ''almost run together;'' that these discolorations on insured's body and leg were not there before the morning that she first saw them; that insured kept his regular office hours on December 21st, 22nd, 23rd and 24th, and he had a birthday celebration on the evening of December 24th, when there were 40 or 50 relatives present; that the following Sunday was the 26th; that on that day he performed his duties as superintendent of the Sunday School, sang in the choir and attended services in the afternoon; that he had no duties to perform at the church in the evening.

Jake Krug testified that he was at insured's house during the noon-hour of December 22, 1937; that insured showed him what the witness described to be bruises on the left side of his abdomen; that the

skin was off of his left leg and "I saw a couple of slivers. . . . Something off a piece of board;" that as he left the house he saw a stepladder, with a piece broken off "from the lower step," laying by the side of the sidewalk under the tree; that the ladder remained there "not much over a day . . . but the piece was there a day or so after the funeral;" that deceased appeared in good health the night of the Christmas party. He was asked what was deceased's appearance in regard to health for a period of six months prior to his death. He answered to the effect that it was good, and that he was not sick during that time.

Insured's daughter testified that she came home from Kansas City, arriving in Russell before daylight of December 23, 1937; that the porch light was on and, as she went into the house, she saw a board on the south side of the sidewalk under the Pine trees on which the wiring had been placed; that the board was about eighteen inches long and three or four inches wide; that one end of it was "jagged and splintered;" that she saw her father for the first time after her return about noon of December 23rd; that he then showed her what she described as bruises on his body, one on the outside of his left leg which extended from the knee to the ankle; that it was "very much discolored" and near the left knee were two little scabs; that there were discolorations on the left side of his abdomen "rather green and blue, and then there was one on his upper left chest;" that her father was home on Christmas Day and on that day he went to see Dr. Koerber in Russell, the family physician; that he went alone; that at this time, he was complaining of pain in the left side of his abdomen in the region of the discolored place; that on Monday, December 27th, he went to see Dr. O'Donnell, at Ellsworth about forty miles from Russell, her mother accompanying him; that they returned home about 3:00 o'clock of that day; that they again went to Ellsworth, the witness driving the car; that insured then entered the hospital in Ellsworth where he remained until his death; that he was treated there by Dr. O'Donnell. Mrs. Krug testified that insured drove his car to and from Ellsworth on the first trip.

Plaintiff sought to prove by a number of witnesses that, when insured exhibited his bruises to them, he stated that, while he was on the ladder taking down the light bulbs, the ladder broke, causing him to fall and bruise his side. The court sustained defendant's objections to this character of testimony.

Dr. Koerber testified that insured called upon him on December 25, 1937; that the latter undressed and showed the witness the left side of his body; that the witness there saw what he described as a "suggillation" about the size of his hand; that the discoloration was a "blackish blue" and that it appeared to come from an external injury; that the discoloration was caused by "hemorrhage following

either pressure, striking, or stroke, or something of an undue nature;'' that he thought there had been a rupture of the spleen, or the pericardium which is the covering of the heart; that he found that the abdomen was larger where the spleen was located; that, ''I had in mind a rupture of the covering of the spleen at that time.'' The witness further testified that suggillation and ecchymosis are practically synonymous; that both mean a subcutaneous hemorrhage that comes to the surface. He further testified that he took the blood pressure of insured and it was 180; that, ''that is high, but it could be higher. We call it high;'' that it was not so high as to be alarming; that by reason of the fact that there was an enlargement in the upper part of the abdomen he advised insured to go to a hospital.

The witness further testified that a number of years before this the insured had consulted him about headaches, but insured was not a sick man; that during that time there was nothing about his appearance that looked unusual; that insured was active in community affairs; that there was nothing in his appearance he saw from day to day that would indicate that he was suffering from any disease; that the suggillation looked like it was four or five days old; that insured was a man of ruddy complexion; that he had headaches in the fall of 1932, but he did not complain of any headaches on December 25, 1937; that no one knows the cause of leukemia.

Dr. Harry D. Taylor, testifying for plaintiff, stated that he was an Osteopathic physician; that he resided in Russell from the fall of 1934 until September, 1937; that he lived in insured's home from September, 1935, until September, 1937; that he became acquainted with insured almost immediately after the witness came to Russell; that he discussed with insured the problem of the latter's high blood pressure; that he found insured had an average blood pressure of 165, systolic; that insured had established a definite level of blood pressure which did not increase; that it varied very little; that insured was inclined to be heavy and, for a man of his physique and build, the witness considered his blood pressure an average one; that he kept track of insured's blood pressure for a period of three years; that he made several examinations of insured's urine to determine whether he had a recurrent or continuing condition of albuminuria; that he found that insured was running no albumin or cast at any time; that when the witness left Russell, in 1937, insured was in good health; that insured had the ''flu'' and a sore throat in 1936 and he advised him to go to the hospital at Ellsworth, which insured did; that he was there several days and returned home, resumed his work gradually and in a very short time he attended to his duties and business just as before; that he saw nothing in insured's condition that would suggest to the witness that he was suffering from leukemia; that if insured's death, on January 1, 1938, were the result of the disease of leukemia, he would think that there would have been some indication

that insured was suffering from that disease in September, 1937; that the manifestation of such a disease would begin with "extreme fatigue; peculiar pallor, possibly, a change in general makeup. . . . There would possibly also be some gastric disturbances, or some signs of it;" that he did not observe anything of that kind in insured's condition; that he was of the opinion that insured was not suffering from any disease when the witness left Russell in September, 1937.

On cross-examination the witness testified that he knew that, in the fall of 1932, insured had been in the hospital at Ellsworth for high blood pressure; that, at the time the witness left Russell, insured was doing nothing for his high blood pressure; that the last time he took insured's blood pressure was shortly before the witness left Russell.

It appears that insured had a health and accident insurance policy with the Mutual Benefit Health and Accident Association and, on December 31, 1937, he made a claim under that policy for sick benefits. Defendant introduced the statement that the insured made to that company on that day, which statement contained the information that insured's disability was "Purpura Hemorrhagica" and that the cause of the disability was "possibly Leukemia." Insured's daughter testified that the words quoted from the statement were in the handwriting of Dr. O'Donnell.

Defendant also introduced in evidence a statement signed by insured, and evidently made in connection with a claim made against the defendant in January, 1933, in which statement insured said that the medical diagnosis of his ailment was "Chronic Nephritis;" that in the fall of 1932, he had been in the hospital at Russell, Kansas, and Menorah Hospital in Kansas City. Plaintiff introduced the record of insured while in Menorah Hospital, which showed that he was suffering then from "Hypertrophy of left ventricle. Moderate dilation of aorta. Arterosolerosia. Chronic passive congestion;" that the final diagnosis was "Chronia Nephritis, with Hypertension." The Electrocardiographic report showed that insured was suffering from Myocarditis. It also appears that insured was in the hospital at Ellsworth in 1936, at which time he thought that he had the "flu" but he was actually suffering from tonsillitis. Plaintiff also introduced in evidence the hospital record of insured's last illness, which showed, among other things: "Head, teeth and gums in poor condition, some bleeding from gums. . . . Abdomen negative except for enlarged spleen. Skin over trunk of legs contains numerous areas of ecchymosis some as large as palm of hand."

Defendant introduced in evidence a certified copy of the Certificate of Death of insured, signed by Dr. O'Donnell, which stated: "The principal cause of death and related causes of importance in order of onset, were as follows: Cerebral Hemorrhage. Contributory causes of importance not related to principal cause: Leukemia." The Death

Certificate contains questions relative to a possible accidental injury and these questions were unanswered by the doctor in the certificate.

Plaintiff introduced in evidence the "Attending Physician's Certificate" signed by Dr. O'Donnell, which was a part of the proofs of death. Plaintiff says that she introduced this for the purpose of impeaching the statements contained in the Death Certificate signed by Dr. O'Donnell. The "Attending Physician's Certificate" contained the following: "(a) State principal cause of death. Cerebral Hemorrhage 1-1-38 (b) Contributory causes of importance. Leukemia." "If accident or external injury contributed in any way to insured's death, give full detail. Had fall and bruised leg two weeks before. Uncertain if it had any bearing."

Plaintiff introduced hospital records pertaining to the last illness of the insured. Dr. O'Donnell was not called as a witness by either party. No post-mortem was made.

Plaintiff called as a witness, Dr. George Hoxie. He did not attend insured as his physician. There was a hypothetical question asked the witness by plaintiff's attorney, in which it was assumed that insured, on the 21st day of December, 1937, fell from a six-foot stepladder in front of his residence as a result of the breaking of the ladder and, in the fall, he received contusions and bruises on his left leg, and the left side of his chest and his abdomen in the region of the spleen. It also assumed the facts shown by the Menorah Hospital records, and those of the Ellsworth Hospital, of and the last illness of the insured, both of which the witness had examined. The witness was asked what, in his opinion, was the immediate cause of insured's death. He answered: "To the best of my knowledge and belief the only explanation that I could find for this man's death was the rupture of the spleen." The witness then went on to explain how death occurred, stating: "The rupture of the spleen would have two effects, one the loss of blood into the abdomen or peritoneal cavity and so on and behind it, and the other the upset to the blood feeding organs so that there would be an abnormal condition of the blood which would gradually increase as the loss of blood through the hemorrhage went on. In other words, the rupture of the spleen did not call for an immediate death but one which would produce a condition which would produce death from the tendency to bleed and from the direct loss of blood itself, so that after several days, that tendency would result in the fatal outcome. . . . When he entered the hospital he showed that he had a calcium content of the blood which was below the normal and, therefore, he was liable to bleed at the moment he received any injury or jolt that might upset the blood equilibrium. The picture of the patient as I get it from the hospital record would not explain on the basis of disease an immediate expectation of death."

He further testified that there was not sufficient evidence in the

hospital records "to make me believe that a true leukemia condition was present;" that Purpura hemorrhagica simply means an increase or abnormal tendency to bleed and is due ordinarily to other basic conditions. It may be, as I interpret the record, due to this lack of calcium in this man's blood. And that left him in a condition where the slightest bang or blow (illustrating) would produce a bleeding point. Ordinarily people with that tendency go along all right until something occurs to produce bleeding which might not be sufficient to produce bleeding in people who do not have that tendency. . . . "The record does not prove that it was cerebral hemorrhage because the death notes as given in that record (indicating) would have occurred, would indicate that the vomiting of blood and that sort of thing had as much to do with the death as cerebral hemorrhage. In other words, I could see nothing in the record to make me understand why cerebral hemorrhage should be claimed as the cause of death.''

On cross-examination he testified that Chronic Nephritis is an inflamation of the kidney. "It is a disease or abnormal condition of the kidney;" that hypertension means a "rise in the blood pressure above the usual limit;" that hypertrophy means an enlarged heart. "Q. Does that indicate a diseased heart? A. No. A football player has a hypertrophied heart. A lumber man who does hard work has a hypertrophied heart. Q. It may become diseased, couldn't it? A. Any kind of a heart may become diseased, but a hypertrophied heart is not necessarily a diseased heart;" that "Moderate dilation of aorta" means that dilation which occurs with age; that arteriosclerosis means hardening of the arteries that occurs with age; that arteriosclerosis does not cause death until it has gone to "an extreme condition so that the artery has no longer any elasticity;" that "Chronic passive congestion" refers to the heart and "that is a swelling he (the doctor making the hospital record) couldn't determine whether it was due to the increase in muscles or just some extra fluid in there;" that myocarditis means that the muscle of the heart is not as sound as it once was and that the heart muscle is somewhat weakened by the wear and tear of life; that ecchymosis means blood spots under the skin; that they may change from a fresh blood color to green or blue; that ecchymosis usually has reference to small spots, and suggillation to larger spots; that they are practically synonymous terms; that cerebral hemorrhage is a bleeding within the skull; that cerebral hemorrhage is quite frequently the cause of death where there is extreme hypertension; that ecchymosis may or may not be a symptom of leukemia; that in a number of cases a ruptured spleen does cause death immediately, but a patient may go on for days before any severe symptoms occur; that when the break is small the patient may go on for days feeling a moderate discomfort but not until after the hemorrhaging develops would he get any symptoms

that would cause him to go to a doctor; that at the stage where pain develops vomiting occurs and the patient complains of headache; that the spleen is in the peritoneal cavity; that "it is close up under the diaphragm and against the back ribs."

On cross-examination he testified that insured's blood pressure, in his opinion, had no bearing on insured's death; that most physicians would not accept as important a blood pressure under 170 or 180.

Defendant's expert witness, Dr. Ralph Emerson Duncan, did not know or see insured during his lifetime, but from his examination of the hospital records, he concluded that insured died of a cerebral hemorrhage and of lymphatic leukemia. He explained in great detail his theory, from reading the hospital records, of how death occurred. However, we need not review his testimony for, in ruling on the demurrer to the evidence, a point raised by defendant, we reject the testimony on the part of the defendant except insofar as it tends to establish plaintiff's case. We might say that the hospital records show profuse general hemorrhaging of the insured immediately prior to his death and the evidence is undisputed that this character of hemorrhaging is common to the last stages of both ailments (ruptured spleen with delayed hemorrhaging and leukemia). There is no assumption that insured suffered a fall in any of Dr. Duncan's testimony.

We shall state some of the testimony of Dr. Duncan which we believe aids plaintiff's case. He stated that neither hypertension nor tonsillitis is an indication of leukemia, but that it is much easier to have a cerebral hemorrhage when there is increased blood pressure; that it is possible that one suffering an injury to the spleen would not have a hemorrhage for several days, depending upon how much the spleen was enlarged; that it is easier to injure the spleen if it is not normal; that the last illness of insured indicated that he was hemorrhaging all over. He testified that ecchymosis was a symptom of lymphatic leukemia, but gave his understanding of the term as "where you have an extravasation of blood in the tissues. *If you get a black eye* that is ecchymosis of the blood under the skin." (Italics ours.)

Defendant insists that its instruction in the nature of a demurrer, offered at the close of all of the testimony, should have been given because, as it contends, there was not any substantial evidence that insured suffered an injury from a fall, caused by the accidental breaking of a stepladder, which injury directly caused his death. In this connection defendant says that, under the allegations of plaintiff's petition, it was necessary for her to show the following, nor of which was established: "1. Fred H. Krug was standing on a stepladder December 21, 1937. 2. While thereon he was caused to fall by the accidental breaking of said stepladder. 3. That he sustained bodily injuries as the result of the breaking of said stepladder and falling. 4. The bodily injuries sustained were evidenced

by visible contusions or wounds on his body. 5. As a direct result of such bodily injuries, and independently and exclusively of all other causes, the same caused his death on the 1st day of January, 1938;'' that none of these things can be established by the testimony adduced by the plaintiff without building an inference upon an inference which, defendant says, is not permitted.

For many years, it was understood to be the rule, in this State, that inferences could not be piled one upon the other in order to establish a given point by the evidence. However, this rule lately has gone through some revision by the Supreme Court. In the case of Wills et al. v. Berberich's Delivery Co., 134 S. W. (2d) 125, the Supreme Court held, to the effect, that the rule is merely one of caution, that ''the strength of the relation between the factual premise and the conclusion is all important.'' [l. c. 129.] It appears now to be the rule that inferences may be piled in order to arrive at a conclusion, so long as the conclusion reached is not too remote.

There is another rule of long standing that has not been modified in any way and that is that as many inferences may be drawn from a fact, or a state of facts, as it will justify, so long as each has a factual foundation. [Morris v. Dupont, 341 Mo. 821, 822.] These inferences are referred to as ''concurrent'' ones in the Wills case. [l. c. 129.]

We think that all of the facts that defendant states were necessary to be proved, and which it claims were not proved, in order to sustain a recovery in this case, were established by the testimony and reasonable inferences that may be drawn therefrom, without building an inference upon another, although the rule of concurrent inferences is applicable to the facts.

There was direct evidence that it had been the practice of insured to go out in the evening, at the time he went out of his house on December 21, 1937 (which was bedtime), and take down such light bulbs as were within the reach of individuals. These were colored bulbs. It was also shown by direct evidence that the stepladder was left that evening so that he could take these bulbs down and bulbs of the kind to be taken down were found on the table by his wife the next morning. She did not directly testify that these were the kind of bulbs she found in the sack on the table the next morning, but it is clear that that is what she meant. The stepladder was found the next day at the place where the bulbs were to have been removed. The ladder was broken and a wooden splinter was found in insured's leg, where he was bruised. Therefore, without building one inference upon another, the jury could have reasonably found that insured removed the light bulbs at the time in question when he went out of the house.

There was direct evidence that insured caused the stepladder to be left so that he could remove those bulbs. As before stated, the stepladder had a broken piece therefrom were found at the place where

he would take them down. The ladder was in good condition a few hours before insured left the house to take the bulbs down. There is nothing in the evidence to suggest that it was used by anyone else except insured and it was found, after his return to the house, in a broken condition. He had wood splinters in his leg the next day and his side was bruised. It was not necessary to pile inferences in order for the jury to find from these facts that he was on the ladder and that it broke with him and he was injured by the breaking. It seems to us that the cause of insured's injuries was clearly established by circumstantial evidence, at least the jury could have so found. There is no question but that the bodily injuries were evidenced by visible contusions because he had bruises thereon near the spleen. That the injury caused his death was shown by the medical testimony which constituted substantial evidence. [Wills et al. v. Berberich's Delivery Co., *supra*, l. c. 136.]

Defendant insists that there is no evidence that the dark places on his body, exhibited by insured, were bruises; that plaintiff and other lay witnesses who testified to this effect were not qualified to know. However, Dr. Koerber testified, to the effect, that they were bruises.

There is nothing in the record tending to show what caused the bruises on insured's body unless they were caused by an accidental fall from the stepladder. There is nothing in the evidence to indicate that he fell from some form of a "stroke," such as a heart attack. In fact defendant does not contend that he may have fallen as a result of a stroke, merely asserting, on this point, that there is no substantial evidence that he fell at all. While, he was afflicted with high blood pressure and other ailments there is evidence from which the jury could arrive at the conclusion that these had not disabled him to any extent for several years prior to his fall. The evidence shows that he had been a very active and energetic man for some time prior to the receipt of his injuries, and apparently in good health. If he had a stroke of some kind it is not reasonable to suppose that he would have gone about his business for several days after he received the bruises on his body. There was ample in the evidence to show that the fall was accidental. [1 C. J., p. 495; Meadows v. Life Ins. Co., 129 Mo. 76.]

We have examined the cases cited by defendant and find them not in point. In Phillips v. Travelers Ins. Co., 288 Mo. 175, insured died of hemorrhage of the brain and, while there was evidence that he had a fall, causing a bruise on his head, the evidence showed that neither his brain nor skull was injured. Plaintiff's medical testimony showed merely that the death of insured might have been caused by an injury to the head suffered in the fall but not that it did cause it, and insured had a disease that could well have caused the fall.

Both plaintiff and defendant cite many cases in connection with this point, many of them accidental death cases where there was no eye-witness. However, cases of this character rest upon facts more or less peculiar to each of them and the cases furnish little aid to the court, except wherein they state general principles.

Defendant seems to think that because Dr. Koerber testified that the so-called blood spots on deceased's body were areas of ecchymosis that they were not bruises, defendant pointing out that ecchymosis is one of the symptoms of leukemia. However, it is quite apparent from all of the testimony, including that of defendant's expert, that ecchymosis may also be the result of a bruise or bruises, and Dr. Koerber testified to the effect that insured was bruised. It is not inconsistent with Dr. Hoxie's theory that insured suffered a ruptured spleen, with general hemorrhaging, to find the hospital records indicated that insured had some areas of ecchymosis on his body not directly caused by his fall. It is stated that the opinion of Dr. Hoxie that insured's death was caused by a ruptured spleen should not be considered in disposing of this point, for the reason that the hypothetical question propounded to him included those things of which defendant states there was no evidence, such as the statement that insured fell as the result of the breaking of a stepladder. We have already pointed out that these things were established in the evidence. It is well settled that, in propounding a hypothetical question to an expert witness, counsel may assume any set of facts which the evidence tends to establish and he is not confined to such facts as have been testified to directly. [Frost v. Central Business Men's Ass'n, 246 S. W. 628; Zeller v. Wolf-Wilson Drug Co., 51 S. W. (2d) 881.]

However, it is contended that the statement in the Attending Physician's Certificate, signed by Dr. O'Donnell, and introduced in evidence by the plaintiff, shows that insured's death was caused by cerebral hemorrhage and the disease of leukemia, and defendant says that these statements in the certificate are not contradicted or explained in any of plaintiff's evidence.

In this connection, defendant says that any knowledge that Dr. O'Donnell had that "insured had fallen and bruised leg two weeks before," as recited in the certificate, was hearsay and, consequently, it and the statement that he was "uncertain if it had any bearing" are not to be considered; that these observations did not in any respect support plaintiff's theory of an accident, for the reason that Dr. O'Donnell had stated point blank that death was caused by a cerebral hemorrhage and the disease of leukemia.

Assuming that the statement, that insured had fallen and bruised his leg two weeks before was hearsay, there was other evidence that he had such a fall and bruises. Consequently, we think, under all of the circumstances, some doubt is cast on the first part of his statement that the cause of death was cerebral hemorrhage con-

tributed to by leukemia, as being an unqualified assertion. However that may be, the plaintiff's medical testimony, if believed, clearly establishes that he did not die of leukemia and it was for the jury to believe or disbelieve that testimony. This is true even if it were contradictory of the Attending Physician's Certificate signed by Dr. O'Donnell, assuming that the certificate is as positive a statement as defendant contends. In this connection it might be well to again recall that while insured was not free from all ailments there was evidence that there was nothing about his health that had incapacitated him to any extent for several years. He appeared and acted like a man in good health. In this condition he suffered an injury and died within ten days thereafter. While he did not immediately fall sick the delay was explained by Dr. Hoxie's testimony concerning his theory of delayed hemorrhage in some cases of a ruptured spleen. Under all of the facts this clearly was a case for the jury.

However, defendant says that, assuming that plaintiff's evidence was sufficient to support the theory of accidental death "the plaintiff's evidence showed that insured's death could or might have been caused by either accident or disease" and it is well established that where the evidence of an alleged accidental death is circumstantial, and if plaintiff's evidence shows that death might have been caused by either accident or disease, for one of which, but not the other, defendant is liable, then plaintiff has not made a submissible case, because this leaves the cause of death to conjecture, guesswork and speculation.

We are of the opinion that plaintiff's evidence does not leave the cause of death to conjecture, guesswork and speculation. Therefore, there is no merit in this contention. In the Wills case, *supra*, 1. c. 131, the court quoted, with approval, from Conner v. Mo. Pac. Ry. Co., 181 Mo. 397, as follows: "If there is substantial evidence tending to show that an accident occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish such cause of the accident as would render the defendant liable, it by no means presents a case of mere conjecture; but is a question of fact, which should be submitted and determined by the triers of the facts. *We only enter the field of conjecture in the absence of proof.* When proof enters, conjecture disappears." (Italics ours.) [See, also, Am. Vt. Lab. v. Glidden Co. et al., 59 S. W. (2d) 53, 69.] The court in the Wills case goes on to say that only where plaintiff's own showing puts the evidence in equipoise, as to whether or not the accident resulted from a cause for which the defendant is responsible, plaintiff has not made out a *prima-facie* case. No such situation is present in the case at bar.

We have examined the cases cited by defendant on this question and find them not in point. In Adelsberger v. Sheeby, 332 Mo. 954,

plaintiff's medical testimony failed to substantiate his claim that the heart disease, from which he suffered, was permanently aggravated by the injury. Of course, the fact that disease may contribute to the disability or cause of death, does not establish that it was not accidental, within the meaning of a policy of this kind. The rule is as stated in Fetter et al. v. Fid & Cas. Co., 174 Mo. 256, 268, as follows: "An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so, as well when the death comes through the medium of a disease directly induced by the injury, as when the injury immediately interrupts the vital processes."

On behalf of plaintiff, the court gave the jury three instructions, reading as follows:

"1.

"The court instructs the jury that if you find and believe from the evidence that the insured, Fred H. Krug, on or about the twenty-first day of December, 1937, was caused to fall from a stepladder at his home in Russell, Kansas, by the breaking of said stepladder, and that he, as the result of said fall sustained bodily injury, if any, and that there was evidence of such bodily injury, if any, by a visible contusion or wound on the exterior of his body, and if you further find and believe from the evidence that the death of the insured on January 1, 1938, was the direct result of such bodily injury, if any, independently and exclusively of all other causes, your verdict should be in favor of the plaintiff and against the defendant insurance company, for the sum of $2500 and you may allow interest thereon at the rate of six per cent per annum from January 17, 1938.

"2.

"In determining whether the death of the insured was the direct result of such accidental injury, if you find that he sustained such injury, you are instructed that by direct result is meant a result of which accidental injury, if any, was the proximate cause, that is, the active, efficient, producing cause.

"3.

"The court instructs the jury that in determining whether the death of the insured was the direct result of injury received from falling from a stepladder on or about December 21, 1937, if you find that he had such a fall and sustained injury therefrom, the fact that he had disease or physical infirmity, if you so find, does not prevent your returning a verdict for the plaintiff, if you find that such disease or physical infirmity, if any, would not have caused the insured to die at the time he did die, except for the accidental injury, if any. Provided you find the facts to be true as submitted to you in instruction number one."

It is insisted that the court erred in giving plaintiff's instruction number one for the reason there is no evidence that insured fell from the stepladder by its breaking and sustained bodily injuries, which caused his death, and that it permits the jury to reach a verdict by guesswork, speculation and conjecture. From what we have said there is no merit in these contentions.

However, it is contended that the instruction, although it purports to cover the entire case and direct a verdict for plaintiff, does not require the jury to find certain facts necessary to establish plaintiff's right of recovery, namely, the injury, which insured sustained which directly caused his death, and the fact that the death was not caused directly or indirectly by the disease of leukemia, and that it ignores the defense that the death was caused by cerebral hemorrhage and the disease of leukemia.

It was not necessary for the plaintiff to have submitted the evidence, in detail, concerning insured's injury and, while the instruction is somewhat general in terms, if defendant thought that the jury would be misled because the specific injury which plaintiff sustained was not submitted in the instruction, it was its duty to offer a clarifying instruction on the subject. [Corbin v. K. C. C. C. & St. Jos. Ry., 41 S. W. (2d) 832, 838; Stanton v. Jones, 59 S. W. (2d) 648.]

It was not necessary for plaintiff to submit, directly, that the death was caused by the disease of leukemia, for the reason that if the jury found the facts, as submitted in the instruction, it found that he did not die of that disease.

The so-called defense that insured died of disease is not, strictly speaking, a defense. The clause in a policy of this kind relative to the exclusion of death caused directly or indirectly from disease, body or mental infirmity, etc., has been referred to as a redundant clause, for the reason, if insured dies as a direct result of bodily injury effected solely through external and violent means, independently and exclusively of all other causes, etc., then he does not die of a disease. Disease is not an affirmative defense for the reason that it can be shown under a general denial (Cross v. Wears, 67 S. W. (2d) 517. See, also Griffith v. Continental Cas. Co., 290 Mo. 455; Smith v. K. C. Pub. Serv. Co., 328 Mo. 979, 996), and, in fact, defendant's answer in this respect consists merely of a general denial, in effect. "If the loss of the eye was caused through external, violent and accidental means, then it could not have been caused by disease contributing to the loss. The instruction, necessarily, excludes any such idea." [Propst v. Capital Mut. Ass'n., 124 S. W. (2d) 515, 522. See, also Cameron v. Mass. Protective Ass'n, 275 S. W. 988, 993; Chenoweth v. Sutherland, 129 Mo. App. 431; Stanton v. Jones, *supra.*]

Complaint is made of the giving of plaintiff's instruction number three. In this connection it is said that the instruction "requires the jury to find facts not supported by the evidence, namely; that even though the insured had disease and physical infirmity, he would not have died of disease or physical infirmity at the time he did, except for the accidental injury." We think there was direct testimony on this point. We find that Dr. Hoxie testified:

"When he (insured) entered the hospital he showed that he had a calcium content of the blood which was below the normal and, therefore, he was liable to bleed at the moment he received any injury or jolt that might upset the blood equilibrium. The picture of the patient as I get it from the hospital record would not explain on the basis of disease the immediate expectation of death *and as nearly as I can understand the record of the hospital the attendants there did not expect that man to die.* (Italics ours.) MR. COLEBERD: I move that that last comment be stricken out. THE COURT: Let it be stricken. Don't give your conclusion about their opinion. A. Well, the treatment instituted was such that the death proved to be unexpected. MR. COLEBERD: I move that be stricken out also. THE COURT: Let it be stricken."

Defendant insists that the court struck out all of the last sentence in the first statement of the doctor. We are of the opinion that it struck out only that part italicized.

However, it is claimed that no such facts were alleged in plaintiff's petition as was submitted in the instruction. It was unnecessary to allege such facts. The instruction merely eliminates matters, appearing in the evidence which would not prevent a recovery, under the facts submitted in plaintiff's instruction number one, that is, if the death of insured was accidental.

However, it is contended that the instruction does not require the jury to find what injury insured suffered, nor does it require the jury to find what disease or infirmity insured had, which would not have caused his death. All of the instructions must be read together and when so read, they sufficiently submit the facts, although, as before indicated, in rather general terms. However, if the instructions were obscure on these points, it was the duty of the defendant to offer clarifying instructions. [Corbin v. K. C. C. C. & St. Jos. Ry. Co., *supra*; Stanton v. Jones, *supra*.]

The instruction does not permit the jury, as claimed by defendant, to indulge in speculation, guesswork or conjecture; nor is it argumentative, or a comment on plaintiff's evidence. [Van Houton v. K. C. Publ. Serv. Co., 122 S. W. (2d) 868, 875.] However, we feel that, in the use of the language, "does not prevent your returning a verdict for the plaintiff," the instruction borders upon the argumentative. We do not approve the instruction as a model.

It is insisted that the court erred in overruling defendant's objec-

tion to the hypothetical question propounded by plaintiff's counsel to plaintiff's witness, Dr. Hoxie, for the reason that it includes facts not in evidence, namely that insured fell from a stepladder as the result of the breaking of the ladder and that in the fall he received contusions and abrasions on the left leg, and a bruise on the left side the chest and abdomen in the region of the spleen. From what have said there is no merit in this contention. The judgment is affirmed. All concur.