258 S.W.2d 290 (1953)
HUGHES et al.
v.
PROVIDENT MUT. LIFE INS. CO. OF PHILADELPHIA.
No. 21843.
Kansas City Court of Appeals. Missouri.
April 6, 1953.
H. M. Langworthy, Clyde J. Linde and Billy S. Sparks, Kansas City, for appellant.
Harry A. Hall, Kansas City, for respondents.
DEW, Judge.
This suit was brought to recover double indemnity under a life insurance policy. From a judgment for the plaintiffs (respondents) *291 for $1334 under the policy, plus $193.43 interest, the defendant has appealed.
It is not disputed that the policy in question was in effect at the date of the death of the insured Conrad P. Hughes, nor is it denied that due notice and proofs of death were given and received. The policy provides for a payment of $5000 upon the death of the insured, which payment was duly made to the beneficiary. By supplementary agreement the policy also provides for an additional payment of $5000 in monthly installments of $23 a month in event of accidental death as prescribed in the agreement. It further provides, among other things, that such additional payments would be made if the death "resulted directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means".
In the succeeding paragraph the policy states, among other excepted risks, that such benefits would not be payable "if the death of the Insured resulted directly or indirectly from or was contributed to by physical or mental disease or infirmity * * *". The demand for payment of the accidental death benefits was refused by defendant. Thereafter, plaintiff Margaret H. Hughes, the beneficiary named in the policy, assigned her benefits under the supplementary agreement to the plaintiff Tyman, a resident of Pennsylvania, and this action was instituted.
Defendant first contends that the trial court erred in not sustaining its motion for a directed verdict at the close of all the evidence. While not admitting that the insured's death was the result of accidental means, defendant states that it "does not pursue that issue here", but granting such assumption, it does assert that plaintiffs' evidence shows conclusively that the death was contributed to by physical disease and infirmity, to-wit, by a congenital aneurysm, which is a dilation or thinning of the wall of a blood vessel, progressively weakening its structure, and is a condition existing from birth. It is contended that the evidence conclusively shows that death would not have occurred except for such congenital aneurysm; that plaintiffs' evidence failed to prove by substantial evidence that the death of the insured was within the terms of the policy.
Conrad P. Hughes, a consulting engineer, 46 years of age, was, according to plaintiffs' evidence, in excellent condition of health on April 18, 1947. He was active, a lover of outdoor sports, such as hunting and fishing, and energetic in his business pursuits. On the morning of April 18, he was in his bathroom shaving with an electric razor. His wife was in an adjoining room and they carried on a conversation from one room to the other. He blew his breath with great force on the razor to remove the accumulated whiskers from the blade. Some of the hairs were sniffed into his nose and immediately caused him to sneeze violently and repeatedly for several minutes, during which he threw his head back and forth. At once his head began to ache severely. He became ill, could not eat his breakfast, complained of pain in the back of his head and constantly rubbed the back of his neck. He went to his office, where he suffered all day with pains in his head and neck. In the evening when he came home he took aspirin and applied ice packs to his neck. The next day a doctor was called, who advised continued rest, aspirin and ice packs. He continued to suffer severe pain in his head and neck. A few days later Hughes visited the doctor, who suspected a ruptured blood vessel at the base of the brain. At home Hughes' condition got progressively worse and on April 29, he had a spell of unconsciousness and his doctor sent him to the hospital. A spinal tap was made, which indicated that there had been a hemorrhage from the ruptured vessel leading into the spinal fluid. His physician testified that probably the first hemorrhage was at the time of the sneezing attack, and others on the day he became unconscious. X-rays were also taken. Hughes died on May 7, 19 days after the sneezing incident. An autopsy was conducted by Dr. Helwig, pathologist at the hospital.
Dr. Hibbard, an associate of Mr. Hughes' attending physician, testified in plaintiffs' behalf. He was not present at the post-mortem, *292 but testified from Dr. Helwig's report of same, introduced by plaintiffs. Dr. Hibbard testified that he believed the hemorrhage took place at the time Mr. Hughes sneezed. He stated that"When a person sneezes he contracts the diaphragm and closes off his blood and raises the pressure in the chest, which prevents the blood coming back from the brain, and, in effect, pushes the blood in the brain and raises the blood pressure in the blood vessels of the brain, and definitely would increase them enough that it is conceivable that a blood vessel could burst under the strain of the sneeze". He said it was conceivable that this could happen even though the condition of the wall of the blood vessel at the place of the rupture was normal. He conceded that a thickening or dilation of an area in a blood vessel would decrease its tensile strength, but did not construe Dr. Helwig's report to state definitely that such condition was found at the exact place of the rupture of the blood vessel in Mr. Hughes' case. He agreed further that an aneurysm could not be discovered by x-ray and could only be disclosed by a post-mortem examination. He stated that a certain condition of arteriosclerosis, found by Dr. Helwig, existed in all persons, which tends to weaken the walls of the blood vessels. He referred to Dr. Helwig's post-mortem report that states that it was a "probable fracture of theof a congenital aneurysm, by a marked thinning and lop-sided thickening of vessels, and hemorrhagic infiltration of the wall of one of the vessels, which is apparently the point of rupture", but that report further states that "dissection of the basilar vessels discloses irregular areas, but no true sacculation or rupture can be grossly identified". Witness stated that a saccular enlargement was typical of congenital aneurysm. He said it was not certain where the exact point of the rupture was, and that Dr. Helwig's report disclosed that he, too, had difficulty in finding the area, although he did find definite arteriosclerosis present in the blood vessels. He said he could not say whether the rupture took place at an area where the vessel was weakened or was healthy. He said arteriosclerosis is not a disease as "we think of diseases usually, a physical disease, it is an aging process, as I said before, that goes on all the time". His opinion was that the violent sneezing caused the pressure which caused the rupture which caused the death.
Dr. Helwig, a witness for the defendant, testified in part as follows:
"A. * * * but it is my considered opinion that the sneeze caused the break.
"Q. And his death? A. And his death, yes. * * *.
"Q. In other words, the direct cause was this pressure created by the sneeze A. Yes, sir.
"Q. that caused the rupture and his death? A. That is my opinion. * * *.
"Q. If the blood vessels had been healthy, the sneeze would not have caused the bursting? A. Oh, No."
But he said in the post-mortem examination he found a massive hemorrhage at the base of the brain of Mr. Hughes; that the rupture was at a place where there was "probably a berry aneurysm", a congenital aneurysm in the artery; that microscopic examination of the unexploded portion of the vessel wall showed the same to be very thin and indicated a congenital aneurysm, "although we could not be positive"; that congenital aneurysm is an imperfection, an infirmity, a weakness and is a serious disease. He also found arteriosclerosis in the blood vessels of Mr. Hughes. He stated that in his opinion a congenital aneurysm contributed to the rupture of Mr. Hughes' blood vessel, which condition, with the sneeze, caused his death.
The first point made on this appeal is that the court erred in overruling defendant's motion for a directed verdict at the close of all the evidence because the plaintiffs' evidence conclusively established the fact that the insured had a disease which contributed to his death and was, therefore, excluded under the terms of the supplementary agreement for accidental death benefits.
Since defendant assumes for the purposes of this appeal that "the means of death *293 were accidental", we shall assume that the sniffing of hair into the nose of insured, the violent sneezing attack that followed, and the consequent acceleration of blood pressure resulting in the bursting or rupture of the blood vessel and the fatal hemorrhage, were brought about by accidental means. Preceded by plaintiffs' evidence of insured's good health at the time of the accident, the proof or admission of the foregoing would make a prima facie case for plaintiffs, provided that neither by their proof nor by admission did they concede that the death resulted also from any other direct, proximate cause and not accidental in character, or, in other words, that the accidental bodily injuries were not "independent of all other causes", the cause of death. Not only did the plaintiffs by their evidence deny the existence of any aneurysm in the insured's blood vessel or any abnormal condition of arteriosclerosis, or other physical disease or infirmity, but their physician testified that the written post-mortem report made by defendant's medical witness and introduced by plaintiffs, did not show any such conditions. Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615.
But it is urged that it was the plaintiffs' burden further to negative the defense that death was "contributed to" by a congenital aneurysm or arteriosclerosis, which defendant says is one of the risks excepted by the policy. In the first place, if treated as an excepted risk, it would be an affirmative defense which the defendant had the burden to prove. Wendorff v. Mo. State Life Ins. Co., supra. Christy v. Great Northern Life Ins. Co., 238 Mo.App. 525, 181 S.W.2d 663, 669. Furthermore, it is our opinion that such defense would not be valid here, whether considered under the general denial as contravening the plaintiffs' proof of the issue "independent of all other causes" or if considered under the exception clause of the policy. This for the reason that under such policies, when accidental bodily injuries of a person in good health are shown as here, followed closely by death, the only causes of death that can be shown to defeat recovery are such as are direct and proximate causes. Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S.W. 592, 595. It cannot be claimed that the original aneurysm or arteriosclerosis caused the sniffing of hair into the nose of the insured, nor the violent sneezing that resulted, nor the acceleration of blood pressure that resulted. In fact, such is assumed by the defendant in this appeal, as stated. It is contended only that the rupture of the blood vessel after the abnormal flow of blood into it was made possible because of the weakened resistance of its walls due to an alleged aneurysm, allowing the fatal hemorrhage. Granting the accidental means, as defendant assumes and the evidence tends to prove, such condition of the walls of the blood vessel would thus plainly be a remote cause, if any, or mere condition and predisposing cause of the rupture and not a direct, efficient, procuring, proximate cause.
Speaking of the term "cause" in similar policies the Supreme Court in Fetter v. Fidelity & Casualty Co., supra, said: "The causes referred to in the policy are the proximate or direct, not the remote causes". In that case the insured, in attempting to lower a window with a stick, accidentally fell on his side against a nearby table, whereupon he immediately began to suffer, was taken home and a few days later to the hospital, where he died less than thirty days after the accident. An autopsy showed a cancer in the kidney near the place where plaintiff's body was struck against the table. It was the opinion of most of the witnesses that the cancerous condition had existed at the time of the accident, and was a predisposing cause of the rupture and hemorrhage, which caused the death. The evidence was that the cancerous condition rendered the rupture more liable to occur than if the kidney had been sound. It was shown that otherwise the deceased was in a good state of health at the time of the accident and would not have died as and when he did if the accident had not occurred, although cancer might have resulted in death, but death would have been deferred several years. The court said: "If, therefore, there could be discovered in a man's body, after his death, any condition before undiscovered *294 and unsuspected, that, under scientific tests, would render him more amenable to accidents, or less capable of resisting their influence, the policy would not cover the case. The fact that a man is 69 years old, yet with an activity of body ordinarily found only in one much younger, might have something to do both with the fact of an accident and its result, and thus his age and unusual activity could be said to be a predisposing causeremote, perhaps, as the learned witness designated the cancer in this casestill, in such case, in that sense, the accident could not be said to have been the cause of the death `independent of all other causes.' The causes referred to in the policy are the proximate or direct, not the remote, causes". Quoting from Freeman v. Accident Association, 156 Mass. 351, the court said: "`Where different forces and conditions concur in producing a result, it is often difficult to determine which is properly to be considered the cause, and in dealing with such cases the maxim, "Causa proxima, non remota, spectatur," is applied. But this does not mean that the cause or condition which is nearest in time or space to the result is necessarily to be deemed the proximate cause. It means that the law will not go farther back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions. The law does not consider the cause of causes beyond seeking the efficient predominant cause, which, following it no farther than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect. An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so as well when death comes through the medium of a disease directly induced by the injury as when the injury immediately interrupts the vital processes'". Applying the above to the case, the court said: "When the plaintiffs introduced evidence tending to show that the insured died of hemorrhage resulting from the accidental fall, they made out a prima facie case. * * * It was not necessary then for them to take up the defendant's side of the case, and prove that the death did not result from any of the excepted causes named in the policies. The defendant, in its answer, had averred that the man died of cancer; the burden was on the defendant to prove it".
In Elbe v. John Hancock Mutual Life Ins. Co., Mo.App., 155 S.W.2d 302, 304, the policy involved contained almost the identical provisions pertaining to causes as here involved. The court there said: "The rule of construction which seems to obtain in some jurisdictions respecting policy provisions similar to the provision with which we are here concerned, that is, if an existing disease or infirmity contributes to cause the death of the insured in the sense that death would not have resulted but for the existing disease or infirmity the insurer is not liable, does not obtain in this state. On the contrary, the maxim causa proxima non remota spectatur is applied". In speaking of such a remote cause the court quoted: "`If, under the peculiar temperament or condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury'".
In Krug v. Mutual Life Ins. Company of New York, 235 Mo.App. 1224, 149 S.W. 2d 393, 395, the provisions of the policy were peculiarly the same as here involved except the provision covering the excepted risks stated that the benefit "will not be payable if death results directly or indirectly *295 from disease or bodily or mental infirmity". The court said 149 S.W.2d on page 403: "It was not necessary for plaintiff to submit, directly, that the death was caused by the disease of leukemia, for the reason that if the jury found the facts, as submitted in the instruction, it found that he did not die of that disease. The so-called defense that insured died of disease is not, strictly speaking, a defense. The clause in a policy of this kind relative to the exclusion of death caused directly or indirectly from disease, body or mental infirmity, etc., has been referred to as a redundant clause, for the reason, if insured dies as a direct result of bodily injury effected solely through external and violent means, independently and exclusively of all other causes, etc., then he does not die of a disease. Disease is not an affirmative defense for the reason that it can be shown under a general denial [citations], and, in fact, defendant's answer in this respect consists merely of a general denial, in effect. `If the loss of the eye was caused through external, violent and accidental means, then it could not have been caused by disease contributing to the loss. The instruction, necessarily, excludes any such idea'. [Citations.]"
It is true that in Christianson v. Metropolitan Life Ins. Co., Mo.App., 102 S.W.2d 682, 684, cited by defendant, the general insuring clause and the clause in the exception provisions in the double indemnity agreement were substantially the same as in the policy in the instant case, including the words "contributed to," in the exception clause, a feature which defendant here contends distinguishes the case at bar from many decisions unfavorable to defendant's theory. It is also true that in the Christianson case this court said that the contract "at least undertakes to restrict as to coverage of results `caused or contributed to, directly or indirectly, wholly or partially by disease'". The court determined that appeal on the finding that the plaintiff had presented two or more causes of death, one of which was covered by the policy only under certain inferences insufficiently supported by the evidence, and another cause not covered by the policy (non-accidental), and ruled that the plaintiff had not sustained his burden of proof. The court did add a reference to the restrictive clauses by stating that there was no evidence that insured's death resulted by accident alone, independent of causes excepted by the policy. However, it is obvious that the ground for reversal was, as stated, that plaintiff did not establish which of two causes did result in the death, one of which was not covered by the policy at all, and the other supported only by inferences insufficiently supported by the evidence. We do not believe that case is a direct authority on the point here made that the plaintiff under such policies having proved death resulting from accidental means, has the burden to disprove that a claimed disease contributed to cause death.
Applying the cases above cited on this point it appears that the exception in the policy here under consideration providing that the death benefit would not be paid "if the death of the insured resulted directly or indirectly from or was contributed to by physical or mental disease or infirmity", amounts to nothing more than a denial of the right to such benefit under the general insuring clause if the death did not "result directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means", which defense would be available to the insurer without any specific provision therefor and even under a general denial.
Our conclusion is that considering the assumptions conceded by the defendant and the most favorable inferences to be drawn from the evidence, the plaintiffs made a prima facie case and the court did not err in overruling the defendant's motion for a directed verdict.
The defendant claims error in the giving of Instructions 1 and 2 offered by the plaintiffs, and in refusing the defendant's Instructions A and B. The plaintiffs' Instruction I advised the jury that the policy in question was admitted and that it was in effect on the dates mentioned thereinafter *296 and that if the jury found that some whiskers accidentally got into the nose of deceased, thereby accidentally causing a violent sneezing attack, which directly caused a rupture of a blood vessel in his brain, which directly caused his death and that evidence of said rupture was revealed by an autopsy, the verdict should be for the plaintiffs, etc. The only objection made to that instruction is that it ignores defendant's defense that an aneurysm contributed to the death of the insured.
As we have said in connection with the sufficiency of plaintiffs' evidence to make a prima facie case, the existence or non-existence of an aneurysm in the blood vessel of the deceased and its predisposing influence, if any, upon the rupture following the accident would not be, under the evidence, a direct, proximate cause of death, and Instruction 1 was not erroneous because it did not require the jury to find that there was no aneurysm in the blood vessel at the time and place of the rupture.
The defendant next asserts that plaintiffs' Instruction 2 was erroneous for the same reason. That instruction told the jury that it was the sole judge of the cause of the death and if the jury found that the death was a direct result of the bursting of the blood vessel in the brain caused by a violent, accidental sneezing attack, as submitted in Instruction 1, that then the verdict should be for the plaintiffs even though the jury find that Hughes' blood vessels were diseased and weak so as to make him susceptible to such injuries and death. Under the authorities we have heretofore reviewed we think this instruction is not erroneous in the respects contended because the diseased condition referred to, if any, would not be a direct and proximate cause of the death in the contemplation of the policy.
Defendant next complains of the court's refusal of its Instructions A and B. Instruction A told the jury that if it found Hughes was seized with the sneezing attack and prior to that date was afflicted with a congenital aneurysm, and that the same was a physical infirmity, and that his death was contributed to by the same, that plaintiffs' could not recover "even though you believe and find from the evidence that the death of Conrad P. Hughes resulted directly and independently of all other causes, from bodily injuries effected through external and accidental means, and your verdict should be for the defendant * * *". This was plainly incorrect for the reason, as heretofore stated, that if the jury found the cause of death to be the accidental bodily injuries, and that the same were independent of all other causes, that finding would exclude a further finding that the death was contributed to by the congenital aneurysm. Krug v. Mutual Life Ins. Co. of New York, supra. It was further incorrect for the reason, as stated, that the aneurysm, if any, was not a direct, proximate cause of death, in view of the evidence.
Defendant's Instruction B told the jury that if they found that Hughes was seized with a sneezing attack and that on and prior to said date he was afflicted with a congenital aneurysm, and the same was a physical infirmity, and that the congenital aneurysm "directly co-operated, concurred and contributed with the sneezing attack in bringing about his death", then plaintiffs could not recover and the verdict should be for the defendant. Here, again we are faced with the fact in evidence that the death resulted directly from the accidental bodily injuries, and that under the evidence, if a congenital aneurysm did exist in the blood vessel of the deceased, that circumstance or condition was merely a predisposing and remote cause and not a direct, proximate cause as meant by the policy, notwithstanding such condition might have co-operated, concurred in and contributed to the death. As heretofore stated, defendant received no rights under the particular exception clause here involved other than to establish the fact that the direct, proximate and predominating cause of the death was disease, infirmity or something other than the accidental bodily injuries shown in evidence. And, as we have said, defendant could make that defense *297 irrespective of the exception clause under consideration. It was not error to refuse defendant's Instruction B.
Finding no error materially affecting the merits of the case, the judgment is affirmed.
All concur.